## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RUTH EATON,** | : | **CIVIL ACTION NO. 3:20-CV-1596** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH HEALTH** | : | |
| **SYSTEMS, INC., d/b/a** | : | |
| **COMMONWEALTH HEALTH** | : | |
| **SYSTEMS, d/b/a WILKES-BARRE** | : | |
| **GENERAL HOSPITAL, LLC, d/b/a** | : | |
| **WILKES-BARRE GENERAL** | : | |
| **HOSPITAL,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Plaintiff Ruth Eaton filed a grievance against her employer, defendant

Wilkes-Barre Hospital Company, LLC ("Wilkes-Barre Hospital" or "the Hospital"),[1]

for deducting accrued leave time during periods of mandated time off at the outset

of the COVID-19 pandemic.  The Hospital ultimately settled the matter in her favor,

but then laid off Eaton and others soon thereafter.  She brings a claim of retaliation

under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, against the

Hospital, which now moves for summary judgment.  We will grant the Hospital's

motion.

---

[1] The complaint names the following entity as Eaton's employer:
Commonwealth Health Systems, Inc. d/b/a Commonwealth Health Systems d/b/a
Wilkes-Barre General Hospital, LLC d/b/a Wilkes-Barre General Hospital.  (See
Doc. 2 ¶ 2).  Defendant avers that it was incorrectly named in the complaint and
refers to itself as "Wilkes-Barre Hospital Company, LLC."  (See Doc. 1 at 1).

I.    **Factual Background & Procedural History**[2]

    A.    **Eaton's Employment with the Hospital**

Eaton began working for Wilkes-Barre Hospital's corporate predecessor, Wyoming Valley Health Care System, in 2006.  (See Doc. 38 ¶ 1).  In September 2008, she transferred into the Hospital's Case Management Department as a nurse case manager, a position that is exempt from the FLSA's overtime requirements.  (See id. ¶¶ 2, 3).  The primary responsibilities of case managers include coordinating the delivery of health care services to patients who arrive at the Hospital for inpatient procedures, elective and nonelective ambulatory surgery, and observation.  (See id. ¶ 5; Doc. 40 ¶ 5).  By March 2020, when the events precipitating this lawsuit began, Eaton was not providing direct clinical nursing care to patients and had not rendered such care professionally for approximately a decade.  (See Doc. 38 ¶¶ 6, 7).

At all times relevant to this dispute, a collective bargaining agreement ("CBA") between the Hospital and the Wyoming Valley Nurses Association / Pennsylvania Association of Staff Nurses and Allied Professionals governed the

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. PA. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the movant's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 38, 40).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

case managers' employment with the Hospital.  (See id. ¶ 4).  Pursuant to Article 15, Section 1 of the CBA, the Hospital "retains the discretion to temporarily reduce staffing on a given unit and shift due to decreased census (or volume)"—*i.e.*, low patient numbers—subject to certain "reassignment" protocols.  (See id. ¶ 11; Doc. 38-2, Ex. A, CBA at 28).  Notably, Section 1(b) of Article 15 gives "senior full time and part time employees in the affected unit and shift" the choice to apply their accrued leave time (other than sick time) to get paid for mandatory periods of time off or to go unpaid for that time.  (Doc. 38 ¶ 11; Doc. 38-2, Ex. A, CBA at 28).[3]

With the onset of the COVID-19 pandemic in March 2020, the Commonwealth put all elective surgeries on hold statewide.  (See Doc. 38 ¶ 8).  As a result, the Hospital experienced low patient volume from late March to early April.  (See id. ¶ 9; see also Doc. 38-2 at 187-88, Daily Census Spreadsheet).[4]  During that period, the Hospital required case managers, including Eaton, to take time off.  (See Doc. 38

_____

[3] Article 15, Section 1 is not expressly limited to hourly employees on its face (see Doc. 38-2, Ex. A, CBA at 28) and the Hospital assumed Eaton and her fellow case managers fell under its auspices.  Eaton denies Section 1's application to salaried employees.  (See Doc. 40, p 11).  Whether the Hospital or Eaton is correct about the provision's applicability ultimately has no bearing on our resolution of the instant motion.

[4] Eaton challenges this characterization as well.  Citing the same data set, the accuracy of which she does not contest, Eaton asserts that the Hospital's "patient census climbed rapidly" from March 30, when she filed her grievance, to April 28, 2020, her last day of work before being laid off.  (See Doc. 40 ¶ 9).  Eaton's analysis is misleading for two reasons.  First, she excludes from her calculation days with high patient volume in early March.  Second, nearly half of the data she relies upon postdates the Hospital's April 14 layoff notice, when patient numbers started to increase.  (See Doc. 38-2 at 188, Daily Census Spreadsheet).  Viewing the data set as a whole, the Hospital is correct that patient volume was relatively low in *early* April.  Moreover, this data is neither relevant nor material to our assessment of Eaton's *prima facie* case.

¶ 10).  It also mandated, in violation of the CBA, that they use available vacation time to cover time missed.  (See id. ¶ 12).  The Hospital paid Eaton her full fixed weekly salary each week during her mandatory time off.  (See id. ¶ 13).

**B.    The Case Managers' Grievances**

Eaton and several other case managers raised concerns about the vacation-time mandate among themselves and with their supervisor, Nancie Matthews, the Director of Case Management.  (See id. ¶ 19).  However, they did not specifically complain that the practice violated the FLSA or any other law.  (See id.)  On March 30, 2020, Eaton submitted a grievance to Matthews pursuant to the CBA.  (See id. ¶¶ 14, 15).  The grievance alleges a violation of "Article 15/FLSA" and states:

> Due to low census, salaried case managers are being mandated to take time off using their vacation and/or personal days for same.  This is in violation of the law under the Fair Labor Standards Act, which requires: "An exempt employee must be paid a salary which is a fixed amount that can't be changed because of variations in the amount or quality of the work performed[.]"  There is work available in other areas which is being assigned to hourly employees.[5]

---

[5] Eaton's grievance appears to paraphrase an FLSA regulation on salaried employees:

> An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

29 C.F.R. § 541.602(a).  The following section describes instances when an employer may "lose the exemption" if it makes "improper deductions" from employees' salaries.  See id. § 541.603(a).

(See Doc. 38-5).  Eaton requested that the Hospital return the depleted time to her and other affected case managers.  (See id.)  She also asked the Hospital not to mandate time off in the future and to reassign salaried employees to other areas before hourly employees.  (See id.)

Thereafter, other case managers collectively filed a grievance through their union representative and fellow case manager, Lori Schmidt, asserting that the mandate violated the CBA.  (See id. ¶ 21).  On April 6, Schmidt submitted the class grievance, which did not allege any FLSA violation, on behalf of herself and seven other case managers.  (See id. ¶¶ 21, 22, 24).  Eaton did not sign the class grievance. (See id. ¶ 23).  The class grievance noted that Article 15 of the CBA stipulates that absent time may be used and does not exempt salaried registered nurses.  (See id. ¶ 25).  Like Eaton, the class requested that the Hospital return their deducted leave time.  (See id. ¶ 26).

On April 8, Eaton emailed Jaime N. Brogan, the Hospital's Director of Human Resources, to inquire about the status of her grievance.  (See Doc. 38-2 at 149).  Brogan replied that she would be "working through" the matter with Schmidt.  (Id.)  On April 14, Brogan informed Schmidt via email that Eaton's grievance was "invalid" because it did not "contain the information required by Article 12 of the" CBA.  (Doc. 40-4).  "Nonetheless," Brogan noted that Eaton and the class raised a similar "concern," which Brogan believed "has been addressed and resolved."  (Id.)  That same day, Schmidt notified Eaton and the other affected case managers that the Hospital agreed to return their vacation time.  (See Doc. 38 ¶¶ 31, 34).

C.    **Hospital-Wide Layoffs & Recalls**

Contemporaneously with its resolution of the grievances, the Hospital

announced that it would downsize various departments, including the Case

Management Department, due to low patient volume.  (See id. ¶¶ 35, 44).  Brogan

decided to lay off six case managers in consultation with the Hospital's chief

financial officer.  (See id. ¶ 38).  The employees ultimately selected for layoffs were

the six least-senior case managers in the department, including Eaton.  (See id.

¶¶ 42, 43).[6]

Brogan informed the six case managers selected for layoffs of the Hospital's

decision at a meeting on or about April 14.  (See id. ¶ 44 & n.1 (noting that the

meeting in fact took place on April 15 (citing Doc. 38-2)).  The layoffs took effect

April 29.  (See Doc. 38-2 at 145).  During the layoff period, the Hospital did not hire

any new case managers.  (See Doc. 38 ¶ 48).  The Hospital eventually recalled the six

laid-off case managers to their prior positions or placed them in different positions

to which they applied.  (See id. ¶ 45).  The Hospital recalled Eaton effective

November 9, 2020, and fully restored her previous pay rate.  (See id. ¶ 47).

D.    **Procedural History**

In August 2020, Eaton filed the instant complaint in the Court of Common

Pleas of Luzerne County, raising a single count of retaliation under the FLSA.  The

---

[6] Of the seven case managers who submitted the class grievance, two were
laid off, including Schmidt.  (See id. ¶ 50).  The Hospital also laid off three of the six
case managers who neither filed nor co-signed any grievance nor otherwise
complained about the mandate to any member of management or human resources.
(See id. ¶¶ 49, 51).

Hospital timely removed the action and then filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, which we denied. The Hospital now files a motion for summary judgment. The motion is fully briefed and ready for disposition.

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion

The FLSA prohibits "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). To that end, federal regulations promulgated

thereunder prohibit employers from reducing an employee's fixed salary during periods of absence "occasioned by the employer or by the operating requirements of the business," so long as work is available and the employee is "ready, willing and able to work."  29 C.F.R. § 541.602(a)(2).  The statute also contains an antiretaliation provision making it unlawful "to discharge or in any other manner discriminate against any employee" because the employee has filed a FLSA complaint.  See 29 U.S.C. § 215(a)(3).  This provision seeks to prevent employer retribution against workers who report FLSA violations.  See Kasten v. Saint-Gobain Performance Plastics Corp., 563  U.S. 1, 12 (2011).

Courts in this circuit analyze FLSA retaliation claims under the burden-shifting framework for Title VII claims.  See Cononie v. Allegheny Gen. Hosp., 29 F. App'x 94, 95 (3d Cir. 2002) (nonprecedential) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973)); see also Preobrazhenskaya v. Mercy Hall Infirmary, 71  F. App'x 936, 939 (3d Cir. 2003) (nonprecedential) (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).  To establish a *prima facie* case of retaliation under the FLSA, a plaintiff "must show that (1) [she] engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) there was a causal link between the plaintiff's protected action and the employer's adverse action."  See Preobrazhenskaya, 71 F. App'x at 939 (citing Kachmar, 109 F.3d at 177).  When a plaintiff makes that threshold showing, the burden shifts to the employer to proffer "some legitimate, non-retaliatory reason" for its decision.  Marra v. Phila. Housing Auth., 497 F.3d 286, 300 (3d Cir. 2007).  If the employer articulates one or more legitimate reasons, the burden returns to the

employee to demonstrate by a preponderance of the evidence that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997)).

For purposes of the instant motion, Wilkes-Barre Hospital concedes that Eaton's layoff constitutes an adverse employment action, thus satisfying the second element of her *prima facie* case. (See Doc. 39 at 5). The Hospital contests the remaining elements of Eaton's claim, *i.e.*, whether the content of her grievance amounts to protected activity under the FLSA and whether a causal link exists between her complaint and subsequent layoff. (See id. at 5-14). Furthermore, the Hospital contends that Eaton cannot carry her burden to rebut its proffered non-retaliatory reason for her layoff: that low patient volume necessitated staffing reductions. (See id. at 14-18).

### A.   Eaton's *Prima Facie* Case

Lodging an internal complaint with one's employer, whether verbally or in writing, may constitute protected activity if it is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection." Kasten, 563 U.S. at 14. Our court of appeals also permits recovery when retaliation "is based on the employer's mistaken belief" that the plaintiff engaged in such activity, even if she did not. See Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 571 (3d Cir. 2002) (citing Fogarty v. Boles, 121 F.3d 886, 891 (3d Cir. 1997); Brock v. Richardson, 812 F.2d 121, 125 (3d Cir. 1987)). To satisfy this first element of her *prima facie* case,

a plaintiff need not prove the merits of her underlying grievance.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).  However, a complaint will only trigger antiretaliatory safeguards if the plaintiff asserts it in subjective good-faith and with an objectively reasonable belief that her employer violated the law.  See Moore, 461 F.3d at 341 (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (*per curiam*); Aman, 85 F.3d at 1085); Spangler v. City of Philadelphia, 523  F. App'x 142, 146 (3d Cir. 2013) (non-precedential); Klastow v. Newtown Friends Sch., 515 F. App'x 130, 132 (3d Cir. 2013) (*per curiam*) (non-precedential); see also Little v. United Tech., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) ("It . . . is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.").

The gravamen of Eaton's grievance is that the Hospital violated the FLSA when it required her to use accrued leave time during mandatory periods of time off.  (See Doc. 38-5).  The Hospital does not contest Eaton's good faith.  It also concedes that it erroneously deducted her leave time—which it subsequently returned—but asserts that the error only contravened the union's collective bargaining agreement, not federal law.  (See Docs. 38 ¶ 12; 39 at 8-11).  Notwithstanding Eaton's allegation that work remained available despite the low patient volume, her claim suffers from an apparent factual deficiency because the record shows that the Hospital did not reduce her fixed *salary* at all during that period.  (See Doc. 38-2, Detail Payroll Register at 11-14).  Indeed, Eaton admits that she received her full weekly pay during the time she was mandated off.  (See

Doc. 38 ¶ 13).  Thus, resolution of the present dispute turns upon whether the Hospital's improper leave-time deductions could give rise to an objectively reasonable belief that it had violated the FLSA.  For this assessment, the objective reasonableness of Jones' belief "must be measured against existing substantive law."  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).

The Hospital submits that the United States Department of Labor addressed this precise issue in a 2009 opinion letter and resolved it in favor of the kinds of leave deductions that prompted Eaton's grievance.  (See Doc. 39 at 9 (citing U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr., FLSA2009-18 (Jan. 16, 2009) (hereinafter "DOL Op. Ltr.")).  In that letter, the Department addressed a health care provider's proposal to require salaried exempt employees to stay home or leave work early during periods of low patient census and to deduct that time from the employees' accrued leave accounts.  (See id.)  The Department responded approvingly, explaining:

> Subject to specific exceptions found in the regulations, an exempt employee must receive his or her full salary for any week in which the employee performs any work without regard to the number of days or hours worked. In no event can any deductions from an exempt employee's salary be made for full or partial day absences occasioned by lack of work. . . .
>
> Employers can, however, make deductions for absences from an exempt employee's leave bank in hourly increments, so long as the employee's salary is not reduced.  If exempt employees receive their full predetermined salary, deductions from a leave bank, whether in full day increments or not, do not affect their exempt status.

DOL Op. Ltr., FLSA2009-18, at 2 (Jan. 16, 2009) (citing 69 Fed. Reg. 22,122, 22,178 (Apr. 23, 2004); DOL Op. Ltr. (Feb. 18, 1999)).  In the Department's view, the FLSA does not preclude employers from reducing exempt employees' accrued leave because those and other fringe benefits are not encompassed in the regulations' contemplation of fixed "salaries"—a position the Department has reiterated numerous times in recent decades.  See, e.g., DOL Op. Ltr., FLSA2005-5 (Jan. 7, 2005); DOL Op. Ltr., 1994 WL 1004772, at *1 (Apr. 13, 1994); DOL Op. Ltr. 1876 (Mar. 30, 1994); DOL Admin. Ltr. Ruling (July 17, 1987).

Our court of appeals has not directly addressed whether the FLSA's salary-reduction prohibitions apply to fringe benefits such as paid leave.  However, other federal courts have credited the Department's analysis and concluded that they do not.  See, e.g., Webster v. Pub. Sch. Empls. of Wash., Inc., 247 F.3d 910, 917 & n.4 (9th Cir. 2001) (noting that "leave time is not salary"); McBride v. Peak Wellness Ctr., Inc., 688 F.3d 698, 705-06 (10th Cir. 2012) (holding that the prohibition against pay-docking for employees who work fewer than eight hours a day "does not extend to non-monetary compensation such as vacation time or sick leave"); accord Litz v. Saint Consulting Grp., Inc., 772 F.3d 1, 4-5 (1st Cir. 2014); see also Higgins v. Bayada Home Health Care, Inc., 2021 WL 4306125, at *8-11 (M.D. Pa. Sept. 22, 2021) (collecting additional cases and concluding that deductions from clinicians' accrued paid-time-off leave bank for failure to meet "expected weekly productivity point figure," which "can be construed as equivalent to an absence from work," does not run afoul of FLSA prohibitions); cf. York v. City of Wichita Falls, 944 F.2d 236, 242 (5th Cir. 1991) (observing that "[t]he relevant regulations provide that [deductions

from sick or vacation leave on an hourly basis] do not establish that a person is paid on a wage basis"); Int'l Ass'n of Fire Fighters, Alexandria Local 2141 v. City of Alexandria, 720 F. Supp. 1230, 1232 (E.D. Va. 1989), aff'd, 912 F.2d 463 (4th Cir. 1990) (explaining that "the docking of leave or accrued compensatory time for absences of less than an entire day [will not] defeat salaried status").

We find the overwhelming weight of this authority persuasive. As the Department and numerous federal courts have concluded, the FLSA does not prohibit employers from docking accrued leave under the circumstances presented here. This legal consensus renders Eaton's underlying grievance objectively unreasonable. We do not doubt that Eaton earnestly believed that the Hospital's actions were improper. But a complainant's subjective belief that an employer violated the law is insufficient to sustain a retaliation claim. Any such belief, even a mistaken one, must be objectively reasonable as well. See Moore, 461 F.3d at 341; Aman, 85 F.3d at 1085; Little, 103 F.3d at 960. Here, the Hospital concedes that it ran afoul of its collective bargaining agreement with the union, and Eaton accepts that concession. (See Docs. 38 ¶ 12; 40 ¶ 12). In light of the foregoing authority, it is not objectively reasonable to believe that the Hospital's actions also contravened federal law. Simply put, "the FLSA neither converts an employer's contract breach into a violation of federal law, nor generally federalizes disputes between employers and employees." Lancaster v. PJM Interconnection, LLC, 2016 WL 4394365, at *5 (E.D. Pa. 2016) (quoting Dunn v. Sederakis, 143 F. Supp. 3d 102, 111 (S.D.N.Y. 2015)).

To the extent Eaton attempts to characterize the Hospital's *mea culpa* as proof that it "mistaken[ly] belie[ved]" she had engaged in protected activity (see Doc. 41 at 19 (quoting Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 571 (3d Cir. 2002)), this argument similarly is meritless.  The record conclusively demonstrates that the Hospital returned the case managers' leave time because it recognized that those deductions were made in error and in violation of the collective bargaining agreement.  (See Doc. 38-4, Brogan Dep. 108:4-9, 111:12-112:19).  The Hospital has consistently maintained that its actions, albeit in error, were consonant with federal law, and Eaton fails to adduce any evidence from which to infer that it ever understood her grievance to constitute protected activity.[7]  In sum, there is no dispute of material fact as to whether Wilkes-Barre Hospital violated the FLSA by docking Eaton's accrued leave.  It did not.

Having forfeited her opportunity to respond to the particulars of the Hospital's challenge to her *prima facie* case, Eaton now implicitly suggests that she engaged in a distinct protected activity by escalating her grievance directly to Brogan.  (See Doc. 41 at 11).  We reject this end-around to establish protected activity.  As a threshold matter, Eaton presumes that escalation constitutes a

---

[7] Eaton offers no rebuttal to the authority marshalled by the Hospital regarding her burden to demonstrate the objective reasonableness of her belief.  We construe this omission to constitute abandonment of arguments relating to burden of proof.  See Diodato v. Wells Fargo Ins. Servs., USA, Inc., 44 F. Supp. 3d 541, 556 (M.D. Pa. 2014) (Conner, C.J.) (collecting cases within the Third Circuit "routinely h[olding] that a non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended").

protected activity separate and apart from filing the initial grievance, but she fails to present case law in support of this proposition. Instead, she merely folds that presumption into her causal-link argument, asserting a close temporal proximity between the date she took her grievance to Brogan and the alleged retaliatory layoff. (See Doc. 41 at 10-11).

Even if we accept Eaton's assertion that escalation is a discrete protected activity, she still must demonstrate that an objectively reasonable person would consider the *underlying conduct* giving rise to her internal complaint a contravention of the FLSA. See Moore, 461 F.3d at 341 ("the employee must hold an objectively reasonable belief . . . that the activity they oppose is unlawful"). In other words, if the action complained of cannot reasonably be considered unlawful, the fact that a complainant later escalates her allegation up the chain of an employer's human resources department does not transform her otherwise unprotected activity into a protected one. See Breeden, 532 U.S. at 270-71 (concluding that summary judgment was appropriate where "no one could reasonably believe" employer's conduct was illegal). Eaton cannot establish an objectively reasonable belief that the Hospital's conduct was illegal. As we have discussed at length, the conduct described in Eaton's grievance does not plausibly amount to an FLSA violation under the objective standard, and Eaton offers no substantive argument or authority to persuade us otherwise. Faced with these clear deficiencies, Eaton's claim fails.

**B.     Pretext**

Assuming *arguendo* that Eaton could demonstrate an objectively reasonable belief and that the six days between her escalation and layoff is sufficient to infer causality, cf. Briggs v. Potter County, 787 F. App'x 123, 131 (3d Cir. 2019) (finding eight days between protected activity and firing "to be suggestive of retaliat[ion]"), her claim would fail nonetheless because she cannot credibly challenge the Hospital's asserted non-pretextual reasons for the layoff.

A plaintiff bears a "difficult burden" when attempting to prove pretext. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  To do so successfully, she must prove (1) that the proffered reason for the adverse action is false and (2) that the real reason for the action was discrimination or retaliation.  Id. at 763 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993)); see also Hicks, 509 U.S. at  519 ("It is not enough, in other words, to *dis*believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.") (emphasis in original).  In that vein, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'"  Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) (emphasis removed)).  Only then can a factfinder reasonably infer that the defendant's non-retaliatory motives were fabricated *post hoc* or otherwise not *bona fide*.  Id. at 764; Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).

The Hospital marshals a large body of evidence supporting its assertion that Eaton's layoff was wholly unrelated to her grievance.  The direct relationship between the Hospital's reduction in staff and the cessation of elective surgeries throughout Pennsylvania at the start of the COVID-19 pandemic is obvious. (<u>See</u>  Doc. 38-2 at 187-88, Daily Census Spreadsheet).  Patient volume dropped precipitously between early- and mid-March 2020 after the statewide freeze took effect.  (<u>See</u> <u>id.</u> at 187).  It is hardly illogical that this decline would lead the Hospital to mandate time off for case managers, whose primary work the parties agree hinges on patient availability.  (<u>See</u> Brogan Dep. 125:23-128:17, 130:20-131:16; Doc.  38-3, Eaton Dep. 89:3-14, 91:2-16, 157:18-163:3).  When the patient census failed to stabilize, falling even further in late-March and early-April, Brogan describes the Hospital as considering the needs of the business and developing a layoff plan.  (<u>See</u> Brogan Dep. 127:16-22, 128:18-129:2, 129:23-133:10).  The plan did not limit layoffs to the Case Management Department, but affected employees throughout the Hospital system, including Human Resources.  (<u>See</u> Docs. 38 ¶ 35; Brogan Dep. 64:17-66:12)). Further supporting the Hospital's proffered justification is the undisputed fact that it selected the six least-senior case managers for layoffs, three of whom had not complained about its mandatory leave practices, and never attempted to replace any of the affected managers for the duration of their layoff.  (<u>See</u> Doc. 38 ¶¶ 43, 48-50; Eaton Dep. 175:16-176:11).  Perhaps most significantly, Eaton testified that she believed the Hospital when it said the layoffs went by seniority.  (<u>See</u> Eaton Dep.  175:16-20).

Eaton attempts to undermine the Hospital's asserted non-retaliatory motives by grasping at a handful of discrete facts of record. (See Doc. 41 at 14-17). First, she argues that the patient census data shows that patient numbers were "rapidly increasing, not declining." (See id. at 14). As we previously noted, however, Eaton's conclusion in this regard rests upon skewed reading of the undisputed statistics. She excludes data predating her grievance which clearly shows a rapid decline in patient volume from early- to late-March, and she includes more than two weeks' worth of data postdating the Hospital's April 14 layoff notice, when patient numbers began to climb. (See Doc. 38-2 at 187-88, Daily Census Spreadsheet).

Next, Eaton claims that Brogan's concurrent involvement in both the grievance process and the layoff decision might lead a jury to reject the Hospital's justification because Brogan could have designed the scope of the layoff to include Eaton. (See Doc. 41 at 15-16 (citing Showalter v. UPMC, 190 F.3d 231, 237-38 (3d Cir. 1999); Sabo v. UPMC, 386 F. Supp. 3d 530, 547 (W.D. Pa. 2019)). Eaton's reliance upon Showalter and Sabo is misplaced. Both cases involved UPMC supervisors who had discretion to design workplace-reduction plans using specific criteria to determine departmental seniority. See Showalter, 190 F.3d at 237-38; Sabo, 386 F. Supp. 3d at 546-47. Based upon facts unique to each affected department, both courts concluded that a jury could find that the supervisors had several available options for calculating seniority, but chose criteria that they knew would affect the oldest employee, see Showalter, 190 F.3d at 327, or that exclusively affected those who took medical leave, see Sabo, 386 F. Supp. 3d at 546, thus belying any non-pretextual rationale. In this case, there is no evidence that Brogan

designed the Hospital's layoff plan to target one or more disgruntled case managers. In fact, Brogan had no discretion to select the individuals who would be laid off. The union's collective bargaining agreement required the Hospital to lay off members of the affected bargaining units in reverse order of seniority.  (See Doc. 38-2, Ex. A, CBA at 25).

Lastly, Eaton claims that Brogan "repeatedly stated that case managers would not be recalled even if the patient census increased," that every case manager was working overtime when the layoffs took effect, and that the Hospital retained two individuals with less seniority.  (See Doc. 41 at 16-17 (citing Eaton Dep. 89:3-17, 90:6-10, 164:13-19, 167-13-19, 176:18-19, 194:4-19)).  It is unclear how Brogan's alleged statement helps Eaton establish targeted retaliation, particularly when she and the other case managers were recalled or obtained other positions at the Hospital within a few months of being laid off.  (See Doc. 38 ¶ 45).  That the Hospital may have changed its plans, under the extreme and *sui generis* circumstances of the pandemic, does not indicate that the proffered rational behind the plan is "unworthy of credence."  See Ezold, 983 F.2d at 531.  Likewise, that case managers were working overtime when the layoffs took effect does not undermine the fact that the Hospital made its layoff decision while it was requiring managers to take time off.  (See Doc. 38 ¶ 10).  And regarding the two less-senior employees retained by the Hospital, Eaton acknowledges that neither was a union member. (See Eaton Dep. 194:4-16).  Accordingly, neither would have been covered by the terms of the CBA, which, as we noted above, dictated the structure of the layoffs.

In sum, Eaton falls short in her efforts to identify facts supporting her assertion of pretext.  Her suggestion that the Hospital essentially concocted its pandemic-induced economic woes and laid off numerous employees in various departments simply to retaliate against her flies in the face of common sense and record evidence.  See Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 785 (7th Cir. 2004) (rejecting as "ridiculous" plaintiff's claim that employer terminated him and nine other employees from his facility "on the pretense of economic hardship" just to get back at him); Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006) (no genuine issue of material fact where plaintiff's attempt to show pretext was entirely consistent with employer's reorganization plan).  To the contrary, she cannot point to any substantive evidence indicating that the Hospital's proffered justification is untrue or that its *bona fide* reasons were retaliatory.  See Hicks, 509 U.S. at 519.  Thus, even assuming that Eaton could show she engaged in a protected activity and a causal link between her activity and the decision to lay her off, her retaliation claim still cannot survive summary judgment.

IV.    **Conclusion**

We will grant Wilkes-Barre Hospital's motion for summary judgment.  An

appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania


Dated:    September 28, 2022